IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Ellen Andrews Maner, | ) | C/A No.: 1:12-2969-RBH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

    A.    Procedural History

On April 27, 2009, Plaintiff filed an application for DIB in which she alleged her disability began on June 1, 2004. Tr. at 123–24. Her application was denied initially and

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

upon reconsideration.  Tr. at 62, 64.  On July 30, 2010, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Charles William Dorman.  Tr. at 28–61 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 27, 2010, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 19–27.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 15, 2012.  [Entry #1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 62 years old at the time of the hearing.  Tr. at 19, 123.  She graduated from college.  Tr. at 46.  Her past relevant work ("PRW") was as a teacher.  *Id.*  She alleges she has been unable to work since June 1, 2004.  Tr. at 123.

2.      Medical History

a.      Pre-onset date

Dr. Neal Shealy at Harrison Peeples Health Care Center ("HPHCC") evaluated Plaintiff on December 12, 2003.  Tr. at 240.  Plaintiff complained of burning pain in the right side of her neck and in her right arm of approximately two months' duration.  Tr. at 240.  The treatment record from this visit also lists a complaint of knee pain for which Plaintiff was taking Aleve.  *Id.*  The record mentions a brain MRI in December 2002, which evidenced Plaintiff's diagnosis of Multiple Sclerosis ("MS").  *Id.*  A cervical spine x-ray in December 2003 showed "some mild marginal osteophyte formation at several

2

levels consistent with degenerative change." Tr. at 395.

On March 22, 2004, Dr. Shealy assessed Plaintiff as having palpitations and fatigue as well as a history of snoring, which he indicated was probably sleep apnea. Tr. at 238. He also noted during this visit that Plaintiff's treating neurologist had prescribed Topamax. *Id.* Dr. Shealy indicated in his treatment note that the palpitations Plaintiff was experiencing could be caused by Effexor, which she was taking for depression. *Id.* He discontinued the Effexor, prescribed Prozac, and ordered Plaintiff to wear a 24-hour Holter monitor. *Id.* The March 23, 2004, report from the Holter monitor noted rare premature ventricular and atrial extrasystoles, frequent sinus tachycardia, and no significant dysrhythmia. Tr. at 393.

On March 25, 2004, Plaintiff returned to HPHCC and reported improvement after switching to Prozac. Tr. at 237. She was noted to be fatigued. *Id.* On April 1, 2004, Plaintiff underwent a right shoulder x-ray. Tr. at 394. The x-ray showed mild degenerative joint changes, but was otherwise unremarkable. *Id.* Dr. Shealy noted shoulder pain during Plaintiff's visit on April 5, 2004. Tr. at 236.

b.    Post-onset date

Plaintiff's alleged onset date is June 1, 2004. Her first documented medical visit after her alleged onset date is a visit to HPHCC on November 10, 2004, during which she stated that she had suffered a fall at Bi-Lo and was having pain and swelling in her right leg. Tr. at 235. During her next visit at the same facility on November 15, 2004, Plaintiff complained of pain in her right hand and left knee as a result of her recent fall. Tr. at 234. X-rays on November 15, 2004, showed some overlying soft tissue swelling in

3

Plaintiff's right hand and moderate degenerative changes in her left knee.  Tr. at 389.
Plaintiff visited HPHCC for a follow-up appointment on November 29, 2004.  Tr. at 233.
She stated that her knee was better, but that she was still having some popping of her
right thumb.  *Id.*

Plaintiff went to HPHCC on December 17, 2004, following a car accident and
reported low back pain and right ankle pain.  Tr. at 232.

On January 12, 2005, Plaintiff presented to HPHCC for an annual examination and
reported being unable to perform a thorough self-examination of her breasts due to
decreased sensation in her hands.  Tr. at 231.

Plaintiff reported she was still experiencing low back pain and problems with her
right thumb on February 3, 2005.  Tr. at 230.  The treatment note from her visit to
HPHCC notes that Plaintiff was involved in an exercise program at Curves.  *Id.*  Plaintiff
also reported low back pain during her visit on February 17, 2005.  Tr. at 229.

Plaintiff was diagnosed with shingles during her appointment with Dr. Shealy on
March 18, 2005.  Tr. at 228.  This treatment record also notes that Plaintiff was obese.
*Id.*  Dr. Shealy's notes of March 24, 2005, indicate that Plaintiff was still being treated for
shingles and that she had recently completed a course of physical therapy for her back
and right thumb.  Tr. at 227.

When Plaintiff returned to HPHCC on May 20, 2005, she indicated that she had
suffered another fall.  Tr. at 226.  She was having left ankle pain and swelling.  *Id.*  This
treatment note indicates that Plaintiff had recently been helping her daughter care for her
granddaughter.  *Id.*  X-rays taken on the same date revealed a plantar calcaneal spur on

4

Plaintiff's left foot and mild degenerative changes in the medial compartment and the patella of her left knee. Tr. at 383.

During her visit with Dr. Shealy on May 27, 2005, Plaintiff was still complaining of some stiffness in her knee. Tr. at 225. Dr. Shealy assessed her as having a left ankle sprain/contusion and osteoarthritis of the left knee. *Id.* His note from this visit describes Plaintiff as "heavy set" and he indicated that she could resume her exercise program at Curves. *Id.* Her weight was listed as 251 pounds. *Id.*

At her next visit to HPHCC on June 28, 2005, Plaintiff was diagnosed with mild cellulitis of the left lower extremity. Tr. at 224. She was still being treated for this condition on July 1, 2005. Tr. at 223.

Dr. Shealy saw Plaintiff for left foot swelling and increased stress on August 5, 2005. Tr. at 220. Dr. Shealy advised Plaintiff to elevate her leg. *Id.*

Dr. Shealy noted on September 9, 2005, that Plaintiff had recently seen a physician for "bariatric" purposes. Tr. at 219. On November 16, 2005, Dr. Shealy's notes indicate that Plaintiff was using the Weight Watchers program in an effort to lose weight. Tr. at 218. On December 13, 2005, Dr. Shealy treated Plaintiff and indicated that she had lost some weight and was down to 239 pounds. Tr. at 216.

On January 30, 2006, Plaintiff again indicated that she was unable to perform a thorough self-breast exam due to decreased sensation in her hands. Tr. at 215. Her weight at that appointment was 234 pounds. *Id.*

On February 22, 2006, Dr. Shealy advised Plaintiff to consider having a sleep study performed. Tr. at 214. Her weight at that visit was 231 pounds. *Id.*

During her visit with Dr. Shealy on March 6, 2006, Plaintiff reported a recurrence of right thumb pain.  Tr. at 213.  Dr. Shealy noted that the pain was probably due to traumatic tendonitis and that she could expect some chronic tendency for pain with use.  *Id.*  Her weight during that visit was 230 pounds.  *Id.*

On December 7, 2006, Plaintiff weighed 255 pounds.  Tr. at 216.  During a visit to HPHCC, she reported increased stress due to the recent death of a friend.  *Id.*  Dr. Shealy noted "malaise" and "obese" on her treatment record for that visit.  *Id.*  During her visit with Dr. Shealy on March 27, 2007, Plaintiff indicated frustration with her weight as well as problems with snoring and pain in her hands and feet.  Tr. at 215.

Plaintiff presented to Dr. Susan Brown at Savannah Neurology, P.C., on April 26, 2007.  Tr. at 280.  Plaintiff's chief complaints were MS and peripheral dysesthesias and she reported continued intense burning dysesthesias of her hands and legs.  *Id.*  She also reported taking a variety of agents for fatigue and dysesthesias with limited success.  *Id.*  Plaintiff complained of poor memory, intermittent dizziness, a persistent Lhermitte's sign, and paresthesias including the vaginal area.  *Id.*  Dr. Brown noted that it was interesting that Plaintiff had never been placed on interferon or Copoxone therapy, but further stated this was, for the most part, because no new clinical events had been observed.  *Id.*  The doctor stated that Plaintiff's MRI brain scans from 1995 were clearly consistent with MS.  *Id.*  Plaintiff weighed 259 pounds and the doctor noted her to be obese.  Tr. at 281.  Dr. Brown prescribed Cymbalta for peripheral dysesthesias; ordered a glucose tolerance test; discontinued Plaintiff's Prozac; advised Plaintiff to consider a nerve conduction study/EMG to assess the probability of a superimposed peripheral

6

neuropathy that may be treatable; ordered that Plaintiff begin Avonex IM injections due to her reported cognitive deficits; ordered a brain MRI; advised Plaintiff to consider Aricept for memory loss; indicated that neurocognitive testing may be in order; and advised Plaintiff to consider biofeedback therapy for chronic pain syndrome. Tr. at 282.

An MRI on April 30, 2007, showed changes of deep white matter as well as hyperintensities in the corpus callosum and pons. Tr. at 205. The differential diagnosis was demyelinating disease and microvascular angiopathy. *Id.*

On May 14, 2007, Plaintiff discussed the South Beach diet with Dr. Shealy as a potential method for weight loss. Tr. at 209. Plaintiff returned to HPHCC on May 21, 2007 and discussed her abnormal fasting glucose as well as the South Beach diet. Tr. at 208.

On June 20, 2007, Plaintiff reported Avonex injections were working well with the exception of transient flu-like symptoms and stated that Cymbalta had improved, but not resolved, her dysesthesias. Tr. at 277. She complained of fatigue. *Id.* Dr. Brown diagnosed MS with symptoms from transverse myelitis, dysesthesias, obesity, and hypercholesterolemia. Tr. at 278. She advised Plaintiff to continue Avonex injections and to work on exercise and weight loss as a way of life. *Id.* Plaintiff's weight during this visit was 257 pounds and increased to 279 by her next visit with Dr. Brown on October 29, 2007. Tr. at 275, 277. At the October visit, Plaintiff reported her that her hands and arms were often numb and that her feet felt tight, likely due to edema. *Id.*

On March 3, 2008, Plaintiff saw Dr. Brown and was noted to be without relapsing/remitting deficits since her last visit. Tr. at 273. Plaintiff continued to complain

of numb hands bilaterally with arm and leg stiffening.  *Id.*  Dr. Brown diagnosed MS, bilateral hand numbness with a history of carpal tunnel syndrome, and stress incontinence.  Tr. at 274.

On April 8, 2008, Dr. Brown noted Plaintiff had moderate-severity left carpal tunnel syndrome and borderline-to-mild right carpal tunnel syndrome status-post release, confirmed by a nerve conduction study.  Tr. at 268.  The doctor further noted that she was delighted that interval MRI imaging of the brain showed no new lesions and encouraged Plaintiff to continue on Avonex.  *Id.*

On April 28, 2008, Plaintiff returned to Dr. Shealy and reported left knee pain.  Tr. at 336.  X-rays of the left knee of June 9, 2008, showed moderate to marked nonuniform narrowing of the medial joint compartment with associated marginal spur formation consistent with degenerative joint disease.  Tr. at 366.  Additionally, the x-ray revealed mild loss of the patellofemoral space with normal spurring and reactive change.  *Id.*

C.      The Administrative Proceedings

1.      The Administrative Hearing

a.      Plaintiff's Testimony

At the hearing on July 30, 2010, Plaintiff testified that she had been a schoolteacher for over 30 years, but that she was diagnosed with MS in 1995.  Tr. at 35–36.  She stated that she continued to work full time until her retirement in 1999 to keep her insurance benefits.  Tr. at 36.  She said that she then worked as long-term substitute teacher until 2004.  *Id.*  She stated that it was easier being a long-term substitute and that she was able to work for a couple of weeks and then take a couple of weeks off.  Tr. at

36–37.  She testified that she stopped working as a substitute teacher in 2004 because she was exhausted and physically could not do it anymore.  Tr. at 37.

Plaintiff stated that during a typical day during the relevant time period, she would get up at 10:00 a.m., eat breakfast, and mostly stay at home.  Tr. at 38.  She said that if she did go out, she required a nap.  *Id.*  She stated that she was able to cook dinner, but would then have to sit and rest.  *Id.*  She testified that she left the house to drive herself somewhere about nine or ten times during a typical week.  Tr. at 42.  She estimated that she could stand for five to ten minutes before having to sit down and could walk for about ten minutes.  Tr. at 43.  She stated she could sit for 30 minutes at the most.  Tr. at 44.

Plaintiff described having numbness in her hands, frequently dropping things, and having trouble writing.  Tr. at 38–39.  She said her medications made her dizzy and very sleepy.  Tr. at 39.  Because of her sleepiness, she said she could not drive out of town.  Tr. at 41.  She stated that she sometimes fell going up steps.  Tr. at 45.  She said she did not think she could work because of the drowsiness caused by her medications and the pain in her legs caused by her MS.  Tr. at 46.

Upon questioning by the ALJ, Plaintiff stated that although she had worked as a substitute teacher during the school year preceding her June 1, 2004, onset date, she chose that date because she knew she was not going to be working any more because "it was physically really bad."  Tr. at 49.  Plaintiff also testified that she participated in an exercise program at Curves for about six months in 2005.  *Id.*  She stated that she went

out to dinner about two times per week, swam at her friend's house about three times per week, and attended church twice per month.  Tr. at 54–55.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Feryal Jubran reviewed the record and testified at the hearing.  Tr. at 56.  The VE categorized Plaintiff's PRW as a teacher as light, skilled work.  Tr. at 57.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could work at the light exertional level, but could only stand or walk for two hours in an eight-hour day; never climb ropes, ladders, or scaffolds; occasionally reach overhead with the right hand or upper extremity; and frequently bilaterally finger and handle.  *Id.*  The hypothetical individual also had to avoid moderate exposure to workplace hazards such as unprotected heights or hazardous machinery.  *Id.*  The VE testified that the hypothetical individual would be precluded from Plaintiff's PRW and there would be no other light jobs in the national economy that the individual could perform because of the limitation on standing and walking.  Tr. at 57–58.  The ALJ then modified the hypothetical to eliminate the standing/walking restriction.  Tr. at 58.  The VE stated that the hypothetical individual would then be able to perform Plaintiff's PRW. *Id.*  The ALJ presented a third hypothetical that included a sit/stand option.  *Id.*  The VE stated that the hypothetical individual would still be able to perform Plaintiff's PRW.  *Id.* The ALJ began to ask a fourth hypothetical, but then noted that at the sedentary level, Plaintiff would "grid out."  *Id.*

Upon questioning by Plaintiff's counsel, the VE stated that a hypothetical individual who would miss approximately one day of work because of pain or fatigue

10

would not be able to sustain employment.  Tr. at 58–59.  Likewise, an individual

requiring unscheduled work breaks for up to 15 minutes an hour would not be able to

sustain employment.  Tr. at 59.

### 2.    The ALJ's Findings

In his decision dated August 27, 2010, the ALJ made the following findings of fact

and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on June 30, 2008.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2004 through her date last insured of June 30, 2008 (20 CFR 404.1571 *et seq.).*

3.    Through the date last insured, the claimant had the following severe impairments: multiple sclerosis; peripheral dysesthesia syndrome; degenerative disc disease; degenerative joint disease of the right shoulder and left knee; and carpal tunnel syndrome (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b).  The claimant must also be able to sit and stand at will.  She could occasionally reach overhead with her right upper extremities and she could frequently handle and finger bilaterally.  However, she could never climb ladders, ropes or scaffolds and she could have no exposure to workplace hazards.

6.    Through the date last insured, the claimant was capable of performing past relevant work as a teacher.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, at any time from June 1, 2004, the alleged onset date, through June 30, 2008, the date last insured (20 CFR 404.1520(f)).

Tr. at 21–27.

3.    Evidence Submitted to Appeals Council

On appeal, Plaintiff submitted a statement from her treating neurologist, Dr. Julia Mikell dated August 1, 2012.  In her written statement, Dr. Mikell indicated that Plaintiff had been under her care for many years due to multiple sclerosis and was "very, very impaired, both physically and cognitively."  Tr. at 9.  Dr. Mikell stated that her office did not fill out forms about lifting and carrying, but further stated that there was no way Plaintiff could be employable and that she was not capable of doing any sort of job that requires thinking or moving.  *Id.*

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ erred in finding Plaintiff was not credible;

2)    the ALJ did not properly consider Plaintiff's obesity;

3)    the ALJ's residual function capacity ("RFC") finding is not supported by substantial evidence; and

4)    the Appeals Council erred in failing to consider a statement from Plaintiff's treating physician.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a.  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g).

14

The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.      Analysis

        1.      Plaintiff's Obesity

Plaintiff alleges the ALJ did not adequately consider her obesity in his decision and thereby failed to comply with SSR 02-1p.  [Entry #11 at 9].  SSR 02-1p provides, in pertinent part, as follows:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.
>
> . . .
>
> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.
>
> . . .
>
> As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.

SSR 02-1p.  SSR 02-1p further provides that "in the absence of evidence to the contrary in the case record, we will accept a diagnosis of obesity given by a treating source or by a consultative examiner."

In support of her assertion that the ALJ did not comply with SSR 02-1p, Plaintiff offers little explanation and cites no evidence.  Nowhere in the administrative process has Plaintiff alleged that her obesity placed any limitations on her functional capacity.  At the

16

hearing, the ALJ identified the impairments that he considered to possibly be severe. Tr. at 34. Obesity was not among them. *Id.* The ALJ asked Plaintiff's counsel if he was missing anything and she responded that she did not think so. *Id.* In her testimony, Plaintiff did not describe obesity as one of her impairments. Likewise, a review of the administrative record demonstrates that Plaintiff did not allege obesity as an impairment in her Disability Reports. *See* Tr. at 148, 162, 173.

The Commissioner is to "consider only impairment(s) [a claimant] says [she has] or about which [the Commissioner] receive[s] evidence." 20 C.F.R. § 404.1512(a). The burden of proof and production rests on Plaintiff to show limitations. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (noting burden of proof and production is on claimant at steps one through four of the sequential evaluation); *Russell v. Chater*, C/A No. 94–2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (noting a claimant must explain the basis of his theory as to how obesity limits his functional ability; speculation is not permitted).

As SSR 02-1p makes clear, conjecture such as Plaintiff now seeks is prohibited:

> [W]e [the Commissioner] will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

SSR 02-1p, available at 2002 WL 34686281, at *6.

For the foregoing reasons, the undersigned recommends finding that the ALJ did not err in failing to specifically consider Plaintiff's obesity in his decision. *See Timms v. Colvin*, C/A No. 5:12-3388-RBH-KDW, 2014 WL 807988 (D.S.C. Feb. 28, 2014). In making this recommendation, the undersigned recognizes that Plaintiff's medical records

include a diagnosis of obesity and notations of weight as high as 279 pounds (*see* Tr. at 277–78); however, it is not incumbent on the ALJ to identify impairments in the record that Plaintiff herself has not raised.

Moreover, even if the ALJ erred by failing to expressly consider Plaintiff's obesity, the undersigned finds that such error is harmless as there is no record evidence of functional limitations. *Cf. Elder v. Astrue,* C/A No. 09–2365, 2010 WL 3980105, at *9 (D.S.C. Oct. 8, 2010) ("As neither her medical records, nor her own statements, provide [evidence of the effect on her functioning or ability to work resulting from] her obesity, any failure of the ALJ to explicitly address [the claimant]'s obesity is only harmless error.").

### 2.     Residual Functional Capacity

Plaintiff next argues that the ALJ erred in assessing her RFC because he did not perform a function-by-function assessment in accordance with SSR 96-8p. [Entry #11 at 11–12]. The Commissioner responds that the ALJ provided an adequate narrative discussion of Plaintiff's impairments and the RFC is supported by substantial evidence. [Entry #13 at 11].

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 404.1545(a). SSR 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p. SSR 96-8p also provides that the RFC assessment must "first identify the individual's functional limitations or restrictions and assess his or her

work-related abilities on a function-by-function basis . . .”; however, this language is not included under the “Narrative Discussion Requirements” setting forth what the ALJ must include in his decision.  *Id.*  The ALJ must discuss the claimant’s ability to work in an ordinary work setting on a regular work schedule.  *Id.*

Although Plaintiff contends the ALJ generally failed to comply with SSR 96-8p, she fails to identify any specific error in his decision.  She does not identify any functional limitation that he failed to consider or cite to evidence demonstrating a functional limitation that may have changed the finding of non-disability.

A review of the ALJ’s decision reveals that he discussed each of Plaintiff’s impairments and the related medical evidence over time.  Tr. at 24–25.  He then explained how the record evidence did not support a finding that Plaintiff was more limited than the RFC determination.  Tr. at 25–26.  Based on Plaintiff’s combined impairments, the ALJ found that Plaintiff could perform light work; never climb ropes, ladders, or scaffolds; never be exposed to workplace hazards; occasionally reach overhead with her right upper extremity; and frequently handle and finger bilaterally.  Tr. at 26.  The ALJ also found that Plaintiff required the ability to stand and sit at will.  *Id.*

Based on the foregoing, the undersigned recommends a finding that the ALJ’s RFC determination is supported by substantial evidence and that the narrative discussion of Plaintiff’s impairments satisfies the requirements of SSR 96-8p.  *See Spicer v. Colvin*, C/A No. 3:12-460, 2013 WL 3929824 (D.S.C. July 29, 2013) (finding narrative discussion sufficient to support RFC determination where the ALJ discussed the medical evidence and cited evidence contradicting Plaintiff’s alleged limitations); *see also Mellon*

*v. Astrue*, C/A 08-2110, 2009 WL 2777653, at *17 (D.S.C. Aug. 10, 2009) (holding the ALJ's implicit findings regarding Plaintiff's functional capabilities were sufficient because the ALJ's narrative discussion provided a logical bridge between his conclusions regarding the claimant's RFC and the evidence).

### 3.     Credibility

Plaintiff also contends that the ALJ erred in his credibility assessment because he did not expressly consider and accord weight to her long and uninterrupted work history. [Entry #11 at 9].  Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged.  *See* 20 C.F.R. § 404.1529; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain).  The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain."  76 F.3d at 594 (internal quotation omitted).  Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work."  *Id.* at 595.  This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's activities of daily living ("ADLs"); the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of

the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not entirely credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC.  Tr. at 216.

In support of this finding, the ALJ noted that Plaintiff's reports to her treating and examining physicians, as well as findings upon objective examination, were inconsistent with her testimony of significant complaints of pain and fatigue.  Tr. at 25.  He further noted that Plaintiff's medications had been relatively effective in controlling her symptoms.  Tr. at 25–26.  He stated that Plaintiff's reports of pain often coincided with the times she helped take care of her granddaughter and that she had missed scheduled appointments while she was taking care of her granddaughter.  Tr. at 26.  The ALJ noted that Plaintiff's ADLs represented a fairly active and varied lifestyle.  *Id.*  These activities included exercising, attending church, visiting with friends, shopping, and driving short distances.  *Id.*  Finally, the ALJ noted the objective evidence did not show any significant medical treatment until five months after Plaintiff's alleged onset date and that the alleged onset date was not precipitated by any major medical event.  *Id.*    Plaintiff does not challenge the grounds upon which the ALJ relied in discounting her credibility.  Rather, she argues only that the ALJ erred in failing to consider her work history.  In making this argument, Plaintiff fails to cite to any authority requiring that work history be considered in assessing credibility.  Because the ALJ identified several reasons for discounting Plaintiff's credibility and those reasons were in accordance with SSR 96-7p, the undersigned recommends a finding that the credibility assessment is supported by

substantial evidence.  To the extent the ALJ may have erred in failing to specifically consider Plaintiff's work history, the undersigned recommends a finding that any such error was harmless.

### 4.    Dr. Mikell's Opinion

Finally, Plaintiff argues that the Appeals Council erred in failing to make specific findings regarding Dr. Mikell's opinion, which Plaintiff describes as new and material evidence.  [Entry #11 at 11].  In her written statement dated August 1, 2012, Dr. Mikell indicated that Plaintiff had been under her care for many years due to multiple sclerosis and was "very, very impaired, both physically and cognitively."  Tr. at 9.  Dr. Mikell stated that her office did not fill out forms about lifting and carrying, but further stated that there was no way Plaintiff could be employable and that she was not capable of doing any sort of job that requires thinking or moving.  *Id.*

The Commissioner argues that the opinion is chronologically irrelevant because Dr. Mikell did not begin treating Plaintiff until more than a year after Plaintiff's date last insured.  [Entry #13 at 15].  The Commissioner further argues that even if the opinion were chronologically relevant, it speaks only on ultimate disability, an issue reserved to the Commissioner.  *Id.*

The undersigned finds the Commissioner's arguments on this allegation of error persuasive.  Because Dr. Mikell did not begin treating Plaintiff until well after her date last insured, the undersigned recommends a finding that the opinion was not material evidence that must be considered by the Appeals Council.  *See Johnson v. Barnhart*, 434 F.3d 650, 655–56 (4th Cir. 2005) (holding medical evidence post-dating claimant's date

23

last insured by nine months was "not relevant" to whether substantial evidence supported the ALJ's decision). Furthermore, even if the opinion could be considered material evidence, it contains only Dr. Mikell's opinion that Plaintiff is disabled, without any functional limitations or evidentiary support. Because the opinion was on an issue reserved to the Commissioner, the undersigned recommends finding that the Appeals Council was not required to consider it. *See* 20 C.F.R. § 404.1527(d) (stating that opinion that a claimant is disabled is not considered a medical opinion because it is on an issue reserved to the Commissioner).

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

Shiva V. Hodges

May 8, 2014                                    Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note.

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d.  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984.